2002-NMCA-052

45 P.3d 406

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Mitchell MORALES, Defendant–
Appellant.**

**No. 21,324.**

Court of Appeals of New Mexico.

March 21, 2002.

Certiorari Denied, No. 27,452,
April 24, 2002.

Patricia A. Madrid, Attorney General, Joel Jacobsen, Assistant Attorney General, Santa Fe, NM, for Appellee.

Liane E. Kerr, Albuquerque, NM, for Appellant.

## OPINION

BOSSON, Chief Judge.

{1} In this case we decide, as an issue of first impression, that the State must prove the scientific reliability of a drug field test in a manner consistent with the *Daubert/Alberico* standard, if it wishes to use the results of that test at trial to identify a controlled substance. Because the State offered no such foundation, we reverse Defendant's conviction for possession of heroin and remand for a new trial on that charge. We affirm Defendant's remaining convictions for aggravated assault (deadly weapon) and aggravated battery on a peace officer (deadly weapon).

## BACKGROUND

{2} On appeal, we view the evidence in the light most favorable to the verdict below. When the facts are disputed below, we resolve conflicting versions of an event in a manner that supports the verdict. *State v. Apodaca,* 118 N.M. 762, 765–66, 887 P.2d 756, 759–60 (1994).

{3} Defendant is a long-distance truck driver. When he is not on the road, he lives with his parents in Anthony, New Mexico. On October 8, 1998, he borrowed his father's car. At about 1:00 p.m., Defendant met his cousin, an acknowledged heroin addict, who had just gotten out of jail that day. At about 3:00 p.m., they drove to El Paso so the cousin could visit his girlfriend, and the three of them drove back to Anthony where they went to the cousin's house for a time, and then drove around Anthony. At about 9:30 that evening, Defendant decided he wanted to go home. He testified that he and his cousin were going to give his cousin's girlfriend a ride to her mother's house. On the way, Defendant pulled into a vacant lot. As he was about to get out of the car, he saw a man on a bicycle pedaling up to the car. The man was going very fast and looked mad. Defendant testified that his cousin looked

back, saw the man, and shouted "go, go!" Defendant got scared and started to drive away.

{4} The man on the bicycle was Deputy Ordonez of the sheriff's department, who was on bike patrol that evening. Deputy Ordonez testified that when he was alongside the car, he identified himself as a deputy sheriff and told Defendant to stop the car. Instead of stopping, the driver accelerated, drove to the end of the vacant lot, did a U-turn, and came back toward Deputy Ordonez. Deputy Ordonez got off his bicycle to wave the car down. However, instead of slowing down, the car came straight at him. Afraid that he would be hit, Deputy Ordonez pulled his duty weapon and pointed it at the car. When the car still did not slow down, Deputy Ordonez began to spin away so he would not be hit, but the car hit his left knee as it went by, throwing him up on the vehicle. Deputy Ordonez landed on his feet, again identified himself as an officer, and ordered Defendant to stop the vehicle. Instead of stopping, the car accelerated away from Deputy Ordonez, and he fell to the ground.

{5} Deputy Ordonez had called for backup before he approached Defendant's car in the vacant lot. As he was lying on the ground, he saw Deputy Luevano approach the vacant lot in his sheriff's vehicle. Deputy Luevano had already engaged his emergency equipment, which included flashing lights, both white and colored. As he pulled into the vacant lot, Deputy Luevano turned on his spotlight and aimed it at the car as it approached him. Deputy Luevano got out of his vehicle, pulled out his weapon and yelled "Sheriff's Department, stop!" The car did not stop. Deputy Luevano testified that he thought the car was going to hit him, and he could feel the car brush his clothes as it went by. The vehicle left the vacant lot and drove away. As Deputy Luevano pursued, the car turned into an apartment complex next to the vacant lot and came to a stop. Defendant was arrested and his car impounded. Defendant was charged with various offenses arising from this encounter.

{6} The next day, deputies from the sheriff's department searched the car. Defendant does not argue that the search was unlawful. Initially, the deputies used a narcotics dog to sniff the vehicle. Based on the dog's reaction, the deputies searched the interior of the car on the driver's side and found a substance wrapped in foil under the floor mat on the driver's side. Deputy Gonzales performed a drug field test on the substance.

{7} At trial, Deputy Gonzales testified about the results of the drug field test and that the substance tested positive for heroin. Based upon that testimony, the substance was admitted into evidence. For reasons not clear from the record, the State did not present any evidence from a state crime laboratory to identify the substance as heroin. Defendant was convicted of possession of heroin.

## DISCUSSION

### Whether the Results of the Drug Field Test Should Have Been Admitted

{8} The issue before us is whether the drug field test had to satisfy the criteria for admission of scientific evidence established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *State v. Alberico,* 116 N.M. 156, 861 P.2d 192 (1993). The State responds on appeal that Defendant failed to preserve this issue for review. On the merits of the question, the State argues in the alternative that the drug field test was not scientific evidence, and that, even if it was scientific evidence, the court properly admitted it under the *Daubert/Alberico* standard.

{9} Testimony on this issue was presented by two different sheriff's deputies, Gonzales and Wright. Deputy Gonzales is the K 9 handler for the sheriff's department. During his initial testimony, he testified about the search of the vehicle and the use of the narcotics dog as part of the search. During the course of his testimony, Deputy Gonzales described the drug field test and indicated (twice) that it had "flashed" positive for heroin. Deputy Gonzales was not shown the substance found in the vehicle, nor was he asked to identify it. Defendant did not object at this time to Deputy Gonzales' testimony about the field test.

{10} After Deputy Gonzales finished testifying, the State called Investigator Wright, who had actually found the substance under the floor mat on the driver's side of the car, and he identified State's exhibit 15 as that same substance. When the State moved to admit exhibit 15 into evidence, Defendant objected, arguing that there was no proper foundation for identifying the substance as heroin, and Defendant specifically referred to the field test. Later, out of the presence of the jury, Defendant expanded his objection to include a citation to *State v. Torres*, 1999–NMSC–010, 127 N.M. 20, 976 P.2d 20. Defendant argued that the foundation required of the field test was similar to the foundation our Supreme Court required of the HGN test for intoxication in *Torres*. Defendant argued that if the State was going to rely on the results of the field test to admit exhibit 15, then it must produce an expert to testify about the scientific principles implicit in the field test and the scientific reliability of those results.

{11} The State responded that it did not need to provide scientific evidence. The State relied instead upon circumstantial evidence that the substance was heroin, including: (1) the testimony of the two deputies who were experienced in narcotics investigations and identified the substance by appearance as heroin; (2) concealment of the substance under the carpet; and (3) the K–9 response to the substance. In addition, the State argued that the testimony was admissible as lay opinion. However, as the trial court pointed out, the dog was trained to alert to a number of controlled substances, and therefore its reaction did not identify the substance as heroin as opposed to some other controlled substance. Although the trial court acknowledged the probative value of circumstantial evidence, in the court's opinion the foundation for exhibit 15 "boil[ed] down" to the field test.

{12} Ultimately, Deputy Gonzales was again called as a witness and questioned in greater detail by both sides concerning the field test. Deputy Gonzales testified that he had been trained in the administration of field tests and had been using them and teaching others how to use them for ten years. In addition, he testified that, based on his experience, the substance removed from Defendant's car had the color, texture, and aroma of black tar heroin. He chose this specific field test because he thought it would test as heroin. He demonstrated the use of the field test for the jury. As we understand the testimony, it is a relatively simple test. A small piece of the suspect substance is put in a vial with the test chemical. The vial is shaken and a chemical reaction takes place that "flashes" a color. The color of the flash varies depending on the nature of the substance. Light purple indicates heroin; dark purple indicates codeine, and orange or brown indicates methamphetamine. Other field test kits are used for other substances such as cocaine, marijuana, and hashish.

{13} By a note to the judge, the jury asked about the accuracy of the field test in percentage terms. Deputy Gonzales responded that he did not know the percentage or statistic, but that based on his experience the test was very accurate and very reliable. The deputy could not explain the chemical reaction that made the test function because he was not a chemist or toxicologist. Essentially, he just knew how to use the kit. Over Defendant's renewed objection, the trial court admitted exhibit 15 into evidence.

## Preservation

{14} The State emphasizes that Defendant did not object when Deputy Gonzales first testified that the field test "flashed" positive for heroin. Based on this failure to object at the very outset, the State now contends that subsequent testimony to the same effect was simply cumulative of what had been heard earlier without objection.

{15} On the facts of this case, we cannot agree. While it might have been preferable if the defense had objected earlier when Deputy Gonzales initially referred to the field test in his testimony, Defendant did object as soon as the State attempted to introduce the substance into evidence as heroin. *See State v. Young*, 117 N.M. 688, 693, 875 P.2d 1119, 1124 (Ct.App.1994) (holding a late *Miranda* objection timely when the grounds for objection ripened). The trial court understood the nature of the objection and that it concerned

the scientific foundation of the field test necessary under *Torres*. The trial court even allowed the State to recall Deputy Gonzales to provide additional testimony about that foundation.

{16} Under these circumstances, we think that Defendant's objection was timely and sufficiently "specific to apprise the trial court of the nature of the claimed error and to invoke an intelligent ruling by the court." *State v. Lucero*, 104 N.M. 587, 590, 725 P.2d 266, 269 (Ct.App.1986). This was a possession case, and Defendant made his objection at the precise time the State offered into evidence the very substance he was accused of possessing. The trial court understood that the field test was the primary evidentiary foundation for that substance.

{17} Although there had been fleeting testimonial references to the results of the field test, the court demanded more and the State offered more, all over objection. Most of the damaging testimony about the field test came after Defendant's objection, because it was specifically designed to rebut that objection. The State never argued below, as it now argues on appeal, that Defendant's *Torres* objection was not timely or had been waived by those earlier references in the testimony. *See Young*, 117 N.M. at 695, 875 P.2d at 1126 (Hartz, J., specially concurring) ("Given the ambiguous record and the State's failure to raise the point below, I would not dispose of the issue on the ground that the motion to strike was untimely."). On balance, therefore, we conclude that Defendant properly preserved his evidentiary objections.

**Testimony Concerning the Field Test Did Not Meet Daubert/Alberico Standards**

■ {18} Whether the *Daubert/Alberico* standard for the admission of scientific evidence applies to a particular situation is a question of law that this Court reviews de novo. *Torres*, 1999–NMSC–010, ¶ 28, 127 N.M. 20, 976 P.2d 20. The State argues that the *Daubert/Alberico* standard does not apply to field test results for two reasons.

{19} First, the State argues that Deputy Gonzales merely testified to his observations. We recognize that part of Deputy Gonzales' testimony was a report of his observations:

what he observed in the course of the chemical reactions. However, the critical portion of his testimony was that the test "flashed" lavender or light purple, and therefore was positive for heroin. Such evidence is similar to testimony concerning the HGN test discussed in *Torres*, 1999–NMSC–010, ¶ 31, 127 N.M. 20, 976 P.2d 20 which involved the "significance of the . . . observation is based on principles of medicine and science not readily understandable to the jury." (Internal quotation marks and citation omitted.) Thus, the deputy testified to more than mere observations. Explicitly or implicitly, he offered an opinion about the meaning of his observations but without the necessary scientific foundation.

■ {20} Alternatively, the State argues that the *Daubert/Alberico* standard does not apply because the principles on which the field test is based are not novel. However, our Supreme Court made clear in *Torres* that the *Daubert/Alberico* standard applies to all scientific testimony, not merely to novel or "cutting edge" scientific theories. *Torres*, 1999–NMSC–010, ¶ 29, 127 N.M. 20, 976 P.2d 20. In short, we find the State's alternative arguments unpersuasive, and we hold the *Daubert/Alberico* standard does apply to the field test when its results are to be used as evidence.

■ {21} Under the *Daubert/Alberico* standard, expert testimony may be admitted under Rule 11–702 NMRA 2002 if the proponent shows (1) that the expert is qualified; (2) that the testimony will assist the trier of fact; and (3) that the testimony is limited to the area of scientific, technical, or other specialized knowledge in which the expert is qualified. *Alberico*, 116 N.M. at 166, 861 P.2d at 202; *see also Torres*, 1999–NMSC–010, ¶ 23, 127 N.M. 20, 976 P.2d 20; *State v. Stills*, 1998–NMSC–009, ¶ 27, 125 N.M. 66, 957 P.2d 51 (explaining the third requirement); *State v. Anderson*, 118 N.M. 284, 291–92, 881 P.2d 29, 36–37 (1994) (explaining the second and third requirements).

[T]he proper inquiry under Rule 702 is whether the subject of the expert's testimony is grounded in valid, objective science, that is "scientific, technical or other

specialized knowledge," and whether the underlying scientific technique or method is reliable enough to prove what it purports to prove, that is probative, so that it will assist the trier of fact.

*Alberico,* 116 N.M. at 168, 861 P.2d at 204. Evidentiary reliability has been described as "the hallmark for the admissibility of scientific knowledge." *Torres,* 1999–NMSC–010, ¶ 24, 127 N.M. 20, 976 P.2d 20.

{22} In his testimony, Deputy Gonzales acknowledged that he knew nothing about the chemical features of the field test and how it produced a certain color that identified heroin. The deputy also had no scientific evidence about the percentage reliability of the field test. Instead, the State relies exclusively on the deputy's own testimony that the field test was reliable. Clearly, this will not do. Our Supreme Court pointed out in *Torres,* 1999–NMSC–010, ¶ 37, 127 N.M. 20, 976 P.2d 20 that "if police officers are not qualified to testify about the scientific bases underlying the . . . test, they are not competent to establish that the test satisfies the relevant admissibility standard."

{23} We emphasize that we do not decide that the results of a field test can *never* be admitted into evidence. We hold only that the State has the burden to establish the validity of the scientific principles on which the test is based and its scientific reliability when the State elects to rely on a field test to prove the identity of the contraband. We further hold that testimony by a law enforcement officer will not, without more, be sufficient to support admission of the results, when the officer cannot explain the scientific principles that the test uses, the percentage of false positives or negatives that the test will produce, or the factors that may produce those false results. We do not address whether the results of a properly substantiated field test would be sufficient, either standing alone or in combination with other circumstantial evidence, to support a conviction for possession of a controlled substance such as heroin. We observe that the State can avoid the problem altogether by using a competent laboratory to identify the substance at issue.

{24} Finally, the State argues that even if the admission of the contraband into evidence was erroneous, the error was harmless and not grounds for reversal. We disagree. Improperly admitted evidence is harmless error only if there is no reasonable possibility that the evidence might have contributed to the conviction. *Torres,* 1999–NMSC–010, ¶ 52, 127 N.M. 20, 976 P.2d 20. In making this determination, we consider three factors: (1) whether there is substantial evidence to support the conviction without reference to the improperly admitted evidence; (2) whether there is such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence appears so minuscule that it could not have contributed to the conviction; and (3) whether there is substantial conflicting evidence to discredit the State's testimony. *Sanchez v. State,* 103 N.M. 25, 27, 702 P.2d 345, 347 (1985); *see also State v. Duffy,* 1998–NMSC–014, ¶ 38, 126 N.M. 132, 967 P.2d 807.

{25} In this case, the only other direct evidence tending to prove the substance was heroin was Deputy Gonzales' opinion that the substance looked and smelled like black tar heroin. Thus, the amount of permissible evidence at trial was not so great that the inadmissible field test evidence could not have contributed to the conviction. Moreover, exhibit 15 was admitted into evidence based upon that field test evidence. Accordingly, we reverse the conviction for possession of heroin.

## Sufficiency of the Evidence to Retry Defendant for Possession of Heroin

{26} In determining whether to order reversal or retrial, we review the evidence presented at trial. The State can retry Defendant on the possession charge only if the conviction was supported by substantial evidence. *State v. Sanchez,* 2000–NMSC–021, ¶ 30, 129 N.M. 284, 6 P.3d 486. Both parties have argued whether the evidence was sufficient to prove that the substance was heroin. For the limited purpose of this part of the analysis, we include the field test results even though we have ruled that evidence inadmissible for lack of a scientific

foundation. *See State v. Post,* 109 N.M. 177, 181, 783 P.2d 487, 491 (Ct.App.1989) (holding evidence that was improperly admitted is considered when determining whether the evidence was sufficient to support the conviction). In addition to the field test, the deputies testified at trial, based on their experience, that the substance had the appearance and smell of heroin and was packaged like heroin. Finally, one of the passengers in the car, Defendant's cousin, was an admitted heroin addict. Considering this evidence together, we are satisfied that the jury could reasonably have concluded that the substance was heroin.

{27} The remaining focus of our inquiry is on whether the evidence was sufficient for the jury to conclude that Defendant was in constructive possession of the heroin. Defendant was not alone in the vehicle on the day in question, and Defendant was not the owner of the vehicle, although he exercised control over that car for most of the day. Defendant's cousin had been with him in the vehicle for several hours, and his cousin was a heroin addict who had only been released from jail that day. There is no evidence that Defendant was an addict or using heroin.

{28} When an accused is not in exclusive possession of the place in which the illegal substance is found, the State is required to prove that the accused knew the substance was there and that he exercised control over it. *See State v. Bankert,* 117 N.M. 614, 620, 875 P.2d 370, 376 (1994) (recognizing that in a drug transaction both the buyer and the seller can be in possession of the drugs); *State v. Phillips,* 2000–NMCA–028, ¶ 8, 128 N.M. 777, 999 P.2d 421 (showing shared-living situation and drugs found in box in dresser drawer); *State v. Brietag,* 108 N.M. 368, 370, 772 P.2d 898, 900 (Ct.App.1989) (showing shared-living situation and drugs found in various places in the house). This Court has recognized that conduct of the accused, and fair inference from the evidence, can be sufficient to establish constructive possession. *Phillips,* 2000–NMCA–028, ¶ 8, 128 N.M. 777, 999 P.2d 421. In this case, the jury was appropriately instructed as follows:

A person is in possession of heroin when he knows it is on his person or in his presence, and he exercises control over it.

Even if the substance is not in his physical presence, he is in possession if he knows where it is, and he exercises control over it.

Two or more people can have possession of a substance at the same time.

A person's presence in the vicinity of the substance or his knowledge of the existence or the location of the substance, is not, by itself, possession.

{29} When a conviction is based on constructive rather than actual possession, this Court must be able to articulate a reasonable analysis that the jury might have used to determine knowledge and control. *State v. Sizemore,* 115 N.M. 753, 758, 858 P.2d 420, 425 (Ct.App.1993). As our Supreme Court has stated, "evidence equally consistent with two inferences does not, without more, provide a basis for adopting either one—especially beyond a reasonable doubt." *State v. Garcia,* 114 N.M. 269, 275, 837 P.2d 862, 868 (1992). In other words, the difference between a legitimate inference based on evidence, on the one hand, and impermissible speculation, on the other, depends on whether the evidence makes one of the two alternatives more likely than the other. *State v. Wynn,* 2001–NMCA–020, ¶ 5, 130 N.M. 381, 24 P.3d 816.

{30} In this case, it is possible that Defendant knew the heroin was hidden under the floor mat. It is also possible that Defendant's cousin obtained the heroin and hid it in the vehicle without Defendant's knowledge. The question is whether the jury had any evidence that would make it more likely that Defendant knew the substance was hidden under the floor mat, as opposed to the possibility that the substance was put there without his knowledge. We think the jury did have such evidence.

{31} Defendant fled from the deputies. The State asserts that "[t]he only plausible motive for Defendant's aggressiveness toward the deputies is, in the words of the prosecutor's closing argument, that 'he was afraid of getting caught with heroin in his car.'" While consciousness of guilt is not the

only inference a jury could reasonably draw from Defendant's conduct, it is certainly one. *Sizemore,* 115 N.M. at 757, 858 P.2d at 424. Although Defendant explained his reasons for flight in benign terms, the jury was not required to believe Defendant's version of the event. *State v. Sutphin,* 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). We cannot overlook the incriminatory nature of Defendant's behavior, the extremes to which he went seemingly to avoid capture, and the inferences a jury could reasonably draw from that conduct.

{32} We need not decide whether evidence of flight, leading to an inference of guilt, would alone be enough to prove Defendant's knowledge and control over the substance beyond a reasonable doubt. In this case, there is more. The contraband was found under the floor mat on the driver's side, and Defendant was the driver. The substance was right under his feet. There was no evidence that Defendant had not been driving or that he had just become the driver. Defendant was in control of the car. These facts give rise to a certain inference of knowledge, even though, as the State concedes, proximity alone would not support a conviction. *See, e.g., State v. Willis,* 320 N.W.2d 726, 728–29 (Minn.1982) (holding there was sufficient evidence of constructive possession where handgun was found protruding from underneath the seat where the defendant/passenger had been sitting, and from where the defendant attempted to flee when officers discovered the gun); *Commonwealth v. Cruz Ortega,* 372 Pa.Super. 389, 539 A.2d 849, 850–51 (1988) (holding totality of circumstances supported a finding of constructive possession where cocaine was found in rented car under defendant/passenger's seat, where police had been informed that the driver was transporting cocaine, and where police had observed the defendant leaning over in his seat before they stopped the vehicle); *State v. Mathews,* 4 Wash.App. 653, 484 P.2d 942, 944 (1971) (holding the defendant/passenger seated in right back seat of the vehicle could be deemed to have constructive possession of heroin found under carpet in right back seat area, when coupled with other circumstances, such as the defendant was a known heroin user and that a bag containing drug paraphernalia was found under the right back seat).

{33} Thus, this is a case of one inference supporting another, leading in combination to a reasonable conclusion that Defendant was likely aware of what was beneath the floor mat. The jury was entitled to disbelieve Defendant's version of the event, and rely instead on fair inferences to the contrary from the evidence. These inferences constitute sufficient evidence in the record to support a jury finding of constructive possession and a verdict of guilty. Accordingly, on remand the State is entitled to retry Defendant on the possession charge.

**Issues Answered Summarily**

{34} Defendant contends that the evidence is insufficient to support his conviction for aggravated battery on Deputy Ordonez because there was no evidence that he intended to injure the deputy. Defendant apparently means that there was no direct evidence that he intended to injure the deputy. However, intent to injure can be inferred from Defendant's conduct and the surrounding circumstances. *State v. Michael S.,* 120 N.M. 617, 618, 904 P.2d 595, 596 (Ct.App. 1995). Deputy Ordonez testified that Defendant drove straight at him, that he thought Defendant was going to run over him when Defendant's car hit his knee. This is sufficient evidence from which the jury could infer an intent to injure Deputy Ordonez.

{35} Defendant also contends that the evidence is insufficient to support his conviction for aggravated assault on a peace officer. The victim in this instance was Deputy Luevano. Defendant points to his own testimony that he was simply trying to leave the vacant lot. However, Defendant's version of the event was contradicted by Deputy Luevano's testimony. When the evidence is conflicting, the jury is not required to believe Defendant's version of the event. *Sutphin,* 107 N.M. at 131, 753 P.2d at 1319.

{36} To convict Defendant of aggravated assault on a peace officer, the State was not required to prove that Defendant intended to injure or even frighten Deputy Luevano. Instead, the State was required to prove, and

the jury was so instructed, that Defendant's conduct caused Deputy Luevano to believe Defendant was about to hit him with his vehicle, that a reasonable person in Deputy Luevano's position would have believed he was about to be hit by the vehicle, and that Defendant's conduct threatened Deputy Luevano's safety. Deputy Luevano testified that he thought he was going to be hit by the vehicle and that the vehicle was so close that he could feel it brush his clothes as it went by. This is sufficient evidence to support the conviction.

{37} Defendant also argues that the trial court erred when it failed to instruct the jury on his theory of the case. Specifically, Defendant argues that the trial court should have instructed the jury that Defendant had a right to defend himself against excessive force by a peace officer and the right to refuse an unreasonable arrest. Defendant concedes that his trial counsel did not tender instructions on either of these theories and therefore the matter must be reviewed for fundamental error. *See State v. Benally*, 2001–NMSC–033, ¶ 12, 131 N.M. 258, 34 P.3d 1134; *State v. Cunningham*, 2000–NMSC–009, ¶¶ 10–11, 128 N.M. 711, 998 P.2d 176.

{38} Defendant's instructions, even if they had been offered below, would have set forth an affirmative defense. The trial court is not required to instruct on affirmative defenses unless it is asked to do so. *State v. Peterson*, 1998–NMCA–049, ¶¶ 7–9, 125 N.M. 55, 956 P.2d 854; *State v. Savage*, 115 N.M. 250, 254, 849 P.2d 1073, 1077 (Ct. App.1992). The cases cited by Defendant all involve situations in which the accused tendered an instruction and the trial court refused to give it. *See State v. Castrillo*, 112 N.M. 766, 769, 819 P.2d 1324, 1327 (1991); *Reese v. State*, 106 N.M. 498, 499, 745 P.2d 1146, 1147 (1987); *State v. Gonzales*, 99 N.M. 734, 735, 663 P.2d 710, 711 (Ct.App.1983).

{39} Moreover, we are not persuaded that this was Defendant's theory below. At trial, Defendant testified that he did not know that Deputy Ordonez was a law enforcement officer and that he did not strike Deputy Ordonez. According to Defendant, the bicycle rider "wiped out" and then ran over and kicked Defendant's car. Similarly, Defendant testified that he did not know Deputy Luevano was a law enforcement officer and that he drove past Deputy Luevano with room to spare. Having testified that he did not know either of the men involved in the incident were law enforcement officers, Defendant was not in a position to argue that he was merely defending himself from excessive force by law enforcement officers or lawfully refusing an unreasonable arrest.

{40} For all of the foregoing reasons, we are not persuaded that the trial court committed fundamental error as Defendant suggests.

## CONCLUSION

{41} We reverse Defendant's conviction for possession of heroin and remand for a new trial on that charge. We affirm Defendant's convictions for aggravated assault and aggravated battery on a peace officer.

{42} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN and CELIA FOY CASTILLO, Judges.